UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

RICHARD A. WILSON, ET AL.,

        Defendants,

_____/

Case No. 14-13831

Honorable Nancy G. Edmunds

**AMENDED[1] OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR LEAVE TO AMEND AFFIRMATIVE DEFENSES [43], DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [44], AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [46]**

This is an action to collect outstanding income tax liabilities against Richard A. Wilson ("Defendant Wilson") and enforce the United States' tax liens against two pieces of property. The government brings two types of tax claims. The first is for income taxes, including penalties and interest, for tax years 1991 through 1994. The second is for payment of Trust Fund Taxes related to FICA withholding taxes that would have been due while Defendant Richard Wilson was the owner of Collision Shop, Inc. (Am. Compl., dkt. 28.) Before the Court are Defendants' Motion Seeking Leave To Amend Affirmative

---

[1] The original Opinion and Order has been amended to correct a typographical error. On the final page, the Opinion and Order should have stated that the grant of money judgment against Defendant Richard Wilson was for unpaid federal income tax liabilities for tax years 1991 through 1994, not 1992 through 1994.

1

Defenses (dkt. 43), Defendants' Motion For Summary Judgment (dkt. 44), and Plaintiff's Motion For Summary Judgment (dkt. 46). The parties filed responses and replies, and the Court held a hearing on these motions on February 24, 2016.

## I.    FACTS & BACKGROUND

### A. Procedural Posture

The Government, Plaintiff, filed this action on October 3, 2014, against Defendant Wilson and naming the following additional Defendants: The R&J Family Limited Partnership a/k/a The R and J Family Limited Partnership, Oakland County Treasurer, Simpson'Wilson Family Limited Partnership, Jean Simpson, Carrie Wilson a/k/a Carrie Simpson Wilson ("Defendant Carrie Wilson"), Comerica Bank, Affordable Construction Co., and Monroe County Treasurer.[2] (Dkt. 1.) Defendants The R&J Family Limited Partnership a/k/a The R and J Limited Partnership[3], Simpson Wilson Family Limited Partnership ("Simpson Wilson") and Carrie Wilson a/k/a Carrie Simpson Wilson filed a Counterclaim on January 21, 2015, and bring claims seeking a judgment quieting title to the Carleton Property and the Holly Property and discharging federal tax liens (Count I); claiming that it would be inequitable for the Court to order foreclosure of any lien or interest under the

---

[2] On April 24, 2015, the Court entered a default judgment against Defendant Comerica Bank and Affordable Construction Co. (Dkt. 21.)   On May 12, 2015, the Court entered a stipulated order setting aside default and entering partial judgment for Defendant Monroe County Treasurer. (Dkt. 23.) On May 28, 2015, the Court entered a stipulated order for entry of partial judgment for Defendant Oakland County Treasurer. (Dkt. 24.)

[3] The Partnership Agreement states that the name is "The R and J Family Limited Partnership" and it will be identified as such through the remainder of this opinion unless it is a direct quote naming it otherwise. (Partnership Agreement, May 24, 1996, dkt. 46-20.)

2

present circumstances (Count II); asking the Court to order Simpson Wilson to convey the Carleton Property to the partners in the trust (Count III); seeking an order making declarations and/or determinations as to the Carleton and Holly Properties (Count IV); and claiming the Plaintiff has no interest in the Carleton and/or Holly Properties (Count V). (Dkt. 5.) Plaintiff filed an amended complaint on July 28, 2015, by stipulation and order. (Dkt. 27, 28.) Plaintiff's amended complaint contains the following counts: unpaid income tax liabilities from Defendant Wilson (Count I), unpaid trust fund taxes from Defendant Wilson (Count II), enforcement of federal tax liens against the Holly Property (County III), and enforcement of federal tax liens against the Carleton Property (Count IV). (Dkt. 28.)

### B. Individual Income Tax Liability

Defendant Wilson operated several collision shops between 1991 and 1998, under entities named Kale's Collision Shop, Worldwide Enterprises, Inc., and Collision Shop, Inc. (Pl.'s Mot. Summary J. Ex. A, R. Wilson Dep. 8-10, 23, dkt. 46-2.) In 1996, the IRS raided Defendant Wilson's businesses (including four locations of Collision Shop, Inc.) and home. (*Id.* at 16:3-9, 117:5.) Defendant Wilson had not paid his income taxes as they became due between 1991 and 1994, and he did not file those returns until approximately 1999. (*Id.* at 14:2-23.) In 1999, Defendant Wilson entered into a plea agreement with the U.S. Attorney's Office and pleaded guilty to one count of tax evasion pursuant to 28 U.S.C. § 7201; agreeing that he willfully failed to file an income tax return for tax year 1994. *See U.S. v. Wilson*, case no. 99-80260 (E.D. Mich. Nov. 30, 1999) (Roberts, J.); (Plea Agreement, July 2, 1999, dkt. 46-3.)

In 2000 and 2003 the IRS assessed tax, penalties and interest against Defendant Wilson for income tax years 1991 through 1994. (M. Echols Decl. dkt. 46-5; J. Junior Decl.

dkt. 46-6.)

| Tax Year | Assessment Date | Assessment Type | Assessed Amount | Balance Due as of 12/1/2015 |
|---|---|---|---|---|
| 1991 | 10/2/2000<br>10/2/2000<br>10/2/2000<br>3/3/2003<br>3/3/2003 | Tax<br>Interest<br>Interest<br>§ 6654 Penalty<br>§ 6651(f) Penalty | $95,778.00<br>$      732.00<br>$63,663.27<br>$5,474.00<br>$71,834.00 | $405,056.30 |
| 1992 | 10/2/2000<br>10/2/2000<br>10/2/2000<br>3/3/2003<br>3/3/2003 | Tax<br>Interest<br>Interest<br>§ 6654 Penalty<br>§ 6651(f) Penalty | $48,262.00<br>$1,681.00<br>$23,755.39<br>$2,105.00<br>$36,197.00 | $191,480.10 |
| 1993 | 10/2/2000<br>10/2/2000<br>10/2/2000<br>3/3/2003<br>3/3/2003 | Tax<br>Interest<br>Interest<br>§ 6654 Penalty<br>§ 6651(f) Penalty | $72,760.00<br>$3,405.00<br>$25,915.40<br>$3,049.00<br>$54,570.00 | $262,642.31 |
| 1994 | 10/2/2000<br>10/2/2000<br>12/11/2000<br>12/11/2000<br>3/3/2003<br>3/3/2003<br>10/18/2010 | Tax<br>Interest<br>Tax<br>Interest<br>§ 6654 Penalty<br>§ 6651(f) Penalty<br>Late Payment Penalty | $8,247.00<br>$1,846.17<br>$76,000.00<br>$26,637.79<br>$4,372.00<br>$63,185.00<br>$1,454.50 | $287,837.32 |
| | | | **Total** | $1,147,016.03 |

(Am. Compl. ¶ 20; J. Junior Decls., dkt. 46-6, 51-2; M. Echols Decl., dkt. 46-5.)

On March 7, 2007, Defendant Wilson filed a petition in the United States Tax Court disputing the penalties and interest assessed for those years. (Petition, dkt. 46-8.) On November 7, 2008, the Tax Court entered a decision sustaining the income tax liabilities which had been determined for those years. (United States Tax Court Decision, docket no. 5576-07L, dkt. 46-9; R. Wilson Dep. 54:23-25, dkt. 46-2.)

4

### C. Trust Fund Recovery Penalties

Beginning in 1993, Defendant Wilson operated four locations of collision shops under the name Collision Shop, Inc. (R. Wilson Dep. 62:4-63:12, dkt. 46-2.) Defendant Wilson was president of the Collision Shop, Inc., during the entire period that it operated.[4] (*Id.* at 102:23-103:10.) On or about June 6, 2000, the Collision Shop, Inc., filed quarterly federal employment tax returns (Form 941) for various tax periods between March 1995 and December 1998. (Defs.' Mot. Summary J. Ex. D, Employer's Quarterly Federal Tax Returns, dkt. 44-5.) The returns showed a balance due. (*Id.*). On February 12, 2001, the government sent Defendant Wilson a letter indicating it had been unsuccessful in its attempt to collect the taxes from Collision Shop, Inc., and that it planned to assess a penalty against Defendant Wilson, noting that these taxes "are commonly referred to as trust fund taxes." (IRS Letter, Feb. 12, 2001, dkt. 44-6.) The total penalty assessed was $248,723.52. (Report of Business's Unpaid Tax Liability, *Id.*)

On April 11, 2001, Defendant Richard filed a protest letter (the "first protest") relating to this assessment. (Young Letter with Protest, Apr. 11, 2001, dkt. 44-7.) There is no dispute that the first protest was timely. (IRS Letter, Sept. 15, 2008, dkt. 44-9.) As set forth in further detail below, Defendants allege that nothing more happened with respect to the first protest until Defendant Wilson received a letter dated September 15, 2008, from Revenue Officer Michael Bryant ("RO Bryant"). (*Id.*) In the letter, RO Bryant reported that it had come to his attention that the matter of the trust fund recovery penalty against Defendant Wilson had not yet been addressed. (*Id.*) The communications from RO Bryant

---

[4] For purposes of their motion, Defendants concede that Defendant Wilson was an officer of Collision Shop, Inc. (Defs.' Mot. Summary J. 3, dkt. 44.)

are the subject of Defendants' motion seeking leave to amend affirmative defenses and motion for summary judgment on the issue of equitable estoppel and are discussed more fully below.

In 2009, a delegate of the Secretary of Treasury made assessments against Defendant Wilson, pursuant to 26 U.S.C. § 6672, in the following amounts:

| Tax Period | Assessment Date | Assessment Type | Assessed Amount | Balance Due as of 7/31/2014 |
|---|---|---|---|---|
| 3/31/1995 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $17,991.00 $63.20 | $21,375.51 |
| 6/30/1995 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $17,868.50 $62.77 | $21,229.99 |
| 9/30/1995 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $17,991.00 $63.20 | $21,375.51 |
| 12/31/1995 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $17,868.50 $62.77 | $21,229.99 |
| 3/31/1996 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $20,341.78 $71.46 | $24,168.53 |
| 6/30/1996 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $20,199.30 $70.96 | $23,999.25 |
| 9/30/1996 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $13,836.21 $48.60 | $16,439.13 |
| 12/31/1996 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $20,382.29 $71.60 | $24,216.66 |
| 3/31/1997 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $11,464.85 $40.27 | $13,621.67 |
| 6/30/1997 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $14,751.21 $51.82 | $17,526.27 |
| 12/31/1997 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $11,855.64 $41.65 | $14,085.96 |
| 3/31/1998 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $17,674.25 $62.09 | $20,999.19 |
| 6/30/1998 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $10,769.22 $37.83 | $12,795.16 |
| 9/30/1998 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $10,615.05 $37.29 | $12,612.01 |
| 12/31/1998 | 7/2/2009 8/3/2009 | Trust Fund Penalty Interest | $9,314.22 $32.72 | $10,893.05 |
|  |  |  | **Total** | **$276,567.88** |

7

(Am. Compl. ¶ 24; J. Junior Decl. ¶ 4, dkt. 46-6.)

**D. Lien Foreclosure On Properties**

Plaintiff seeks to enforce federal tax liens on two parcels of real property. The first is identified in the Complaint as the "Holly Property." The Holly Property is known as 15224 Riviera Shores, Holly, Michigan 48442. The second is identified as the "Carleton Property." The Carleton Property is known as 339 Monroe Street, Carleton, Michigan 48117-9162.

**1. Holly Property**

On June 14, 1996, Defendant Wilson quit claimed his interest in the Holly Property to the R and J Family Limited Partnership for "0" or no consideration.[5] (Quit Claim Deed Holly Property, dkt. 46-18; R. Wilson Dep. 127:6-128:2, dkt. 46-2.) Defendant Wilson and his mother, Julie Wilson, established The R and J Family Limited Partnership on May 24, 1996 (Partnership Agreement, May 24, 1996, dkt. 46-20.) Defendant Wilson was the general partner and Julie Wilson was the limited partner. (R. Wilson Dep. 173:11-21.) With his mother deceased, her interest in the partnership was purportedly transferred in 2001 to the Julia W. Wilson Revocable Trust ("JW Trust"). (R. Wilson Dep. 128:8-19; Decl. and Agreement Of Trust- The Julia M. Wilson Revocable Trust, dkt. 46-21.) The JW Trust would own her portion of The R and J Partnership. The trustees for the JW Trust are Defendant Wilson and his wife, Defendant Carrie Wilson. (R. Wilson Dep. 128:3-21, dkt. 46-2; Decl. And Agreement Of Trust 26, dkt. 46-21.) Defendant Wilson is the designated beneficiary of the JW Trust's interest in The R and J Family Limited Partnership. (R. Wilson Dep.

---

[5]Additional conveyances of the Holly Property initiated by Julia Wilson, which occurred in January 1996, the same month as Defendant Wilson's business and home were raided by the IRS, are discussed below where necessary to the analysis. (Am. Compl. ¶¶ 30-33, dkt. 28.)

8

168:5-16, dkt. 46-2; Decl. And Agreement Of Trust 6, dkt. 46-21.) Defendant Wilson and Defendant Carrie Wilson have lived on the Holly Property and treated it as their residence since 1998. (C. Wilson Dep. 50:23-51:2, dkt. 46-13.) They do not pay rent to live at the Holly Property. (R. Wilson Dep. 130:25-131:3, dkt. 46-2; C. Wilson Dep. 63:23-64:2, dkt. 46-13.) Prior to their moving to the Holly Property full-time, it was used as a weekend home by the family. (C. Wilson Dep. 48:17-50:22, dkt. 46-13.)

### 2. Carleton Property

Defendants Richard and Carrie Wilson received the Carleton Property by quit claim deed from Carrie's parents in June 2001. (Defs.' Resp. Ex. G, Quit Claim Deed Carleton Property, dkt. 49-8, 46-23; C. Wilson Dep. 85:5-19, dkt. 46-13.) Defendant Carrie Wilson's mother, Jean Simpson, retains a life estate in the Carleton Property.[6] (Quit Claim Deed Carleton Property, dkt. 49-8, 46-23.)

On August 25, 2005, Defendant Wilson and Defendant Carrie Wilson transferred recorded title of the Carleton Property to the Simpson Wilson Family Limited Partnership for no consideration, reserving a life estate unto themselves. (Quit Claim Deed Carleton Property, dkt. 46-22.) The Simpson Wilson Family Limited Partnership has only two partners: Defendant Carrie Wilson, general partner, and Defendant Wilson, limited partner. (C. Wilson Dep. 93:25-94:8, dkt. 46-13.) Carrie holds 99 percent and Defendant Wilson holds one percent. (*Id.*) The Simpson Wilson Family Limited Partnership holds only the Carleton Property; it has no other assets, generates no income and has no expenses. (C.

---

[6] Defendant Carrie Wilson testified that her father had "inadvertently" put her husband's name on it, "which never should have been on the property." (C. Wilson Dep. 92:12-20.) As Plaintiff points out, Defendants have identified no admissible evidence of Carrie Wilson's parents' "intent" in putting Defendant Wilson's name on the deed.

9

Wilson Dep. 93:14-24, dkt. 46-13.)

Plaintiff seeks to enforce federal tax liens on both properties.

## II.   ANALYSIS

### A. Defendants' Motion For Leave To Amend Affirmative Defenses [43]

Defendants move the Court to allow them to amend their affirmative defenses to add the defense of unclean hands and/or "Plaintiff's failure to do equity." (Defs.' Mot. Seeking Leave To Amend, dkt. 43.) Defendants allege that they received discovery responses from Plaintiff in early November [2015], including nearly 600 pages of documents. (Dkt. 43 ¶ 2.) They allege that

> Within those responses were certain notes and/or histories maintained by Revenue Officer Michael Bryant that demonstrate that Mr. Bryant intentionally deceived Richard Wilson and his attorney in 2008. Specifically, these documents reveal that Mr. Bryant was advised by Technical Services that certain taxes could not be assessed against Mr. Wilson unless Mr. Wilson submitted a new protest or resubmitted a protest previously made. Not only did Mr. Bryant refuse to disclose this to Mr. Wilson and his counsel, Mr. Bryant deliberately mislead them by claiming that the only way that Mr. Wilson would be provided an opportunity to defend against the assessment would be to file a new protest or to resubmit a protest previously filed.

(*Id.*) Defendants explain the alleged misconduct in further detail in their motion for summary judgment.

Under Fed. R. Civ. P. 15(a)(2), aside from the limited circumstances in which a party may amend as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason– such as . . . futility of amendment, . . . – the leave sought should, as the rules require, be 'freely given.'").

There is neither evidence nor allegation that Defendants have been dilatory in seeking to amend the affirmative defenses at this late date. They filed this motion on December 11, 2015, within a month of receiving the discovery requests which informed a basis for the defense. Plaintiff argues that the amended affirmative defense should not be allowed because it would be futile. "This Circuit has addressed the issue of "futility" in the context of motions to amend, holding that where a proposed amendment would not survive a motion to dismiss, the court need not permit the amendment." *Thiokol Corp. v. Dept. Of Treasury, State of Michigan*, 987 F.2d 376, 383 (6th Cir. 1993); *see also Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417 (6th Cir. 2000).

The government sent an IRS Letter 1153 dated February 12, 2001, to Defendant Wilson informing him that it intended to personally assess him for the portion of taxes reflected in the quarterly federal employment tax returns (the Form 941), filed by the Collision Shop, as a "trust fund recovery penalty" and informing him how to appeal or protest the action. (IRS Letter, Feb. 12, 2001, dkt. 44-6.) The amount claimed totaled $248,723.52. (Dkt. 44-6.) Because the action involved an amount greater than $10,000, Defendant was required to file a written "protest." Defendant Wilson filed the first protest on or about April 11, 2001. (Young Letter, Apr. 11, 2001, dkt. 44-7.) The parties agree that there is no dispute that in 2008, years after Defendant Wilson filed the first protest, RO Bryant discovered that IRS Appeals had not made a final determination with respect to it. RO Bryant sent Defendant Wilson a letter dated September 15, 2008, notifying Richard Wilson that the matter of the trust fund recovery penalty recommendation against him had not yet been addressed. (IRS Letter, Sept. 15, 2008, dkt. 44-9.) It further noted that his timely protest, received on April 12, 2001, "requires that the matter be referred to the IRS

11

Appeals Function before a final determination was made" to have him "assessed or not"

and that research showed that no determination had been made "as of yet." (*Id.*) The letter

also stated that

> In order to ensure that you are provided every opportunity to defend against
> the recommendation that you should be assessed the $248,723.52 it is vital
> that you are now complete (sic) the enclosed Form 4180 document, and that
> you provide a photocopy of the protest you submitted to Mr. Collins. If you no
> longer have the original protest letter, and any related documentation, you
> are still able to provide a current updated protest statement outlining your
> objection to the assessment with any supporting documentation. The 4180
> and protest are to be provided with the other items required by October 1,
> 2008 as outlined in my letter of September 10, 2008.

(*Id.*).

Defendants' allegation that RO Bryant's communication was misleading is based on

a document titled "ICS History Transcript." In an entry dated September 15, 2008, it states:

> – Their research confirmed RO suspions(sic) that the appeal of Richard
> Wilson does not appear to have been sent to Tech. Services and ultimately
> to A ppeals(sic).
>
> – Since the protest was timely the ASED has been extended. The ASED
> would not start to run again until Appeals actually finally makes a
> determination at which point the government has 30 days to finally assess
> the trust fund against Mr. Wilson.
>
> – Unfortunately, the only way to get the matter to Appeals for consideration
> now is to get a copy of the protest letter from Richard Wilson. RO was
> advised that if Wilson fails to provide a protest at this time there is no hope
> of evalating(sic) the possibility of assessing Wilson at this time.
>
> – With the protest letter RO could use ATFR to recreate a trust fund file, but
> it appears that the ATFR histories show that TP's trust fund file was approved
> by RO Collin's  manager in 2003 to be returned to some sort of [illegible]
> holding file from which nothing has happened since.

(ICS History Tr., dkt.44-8.)

A report of a telephone call on approximately September 22, 2008, between RO

Bryant and Defendant Wilson's attorney, notes that RO Bryant "reviewed with him" that "Appeals had not been provided the trust fund file for a final determination, therefore, the ASED is extended indefinitely until Appeals finally makes a determination." (ICS History Tr., dkt. 44-10.) Defendants allege that "Richard and his attorney took Bryant at his word – that the only way Richard would be assured 'every opportunity to defend against the recommendation that he should (sic) assessed the [Trust Fund Taxes]'", as stated in the September 15, 2008 letter, "was to provide a new protest," and they did so on October 15, 2008. (Defs.' Mot. Summary J. 5; Young Letter, Oct. 15, 2008, dkt. 44-11.) Defendants allege that this statement was "outright false" and that Defendant Wilson's best opportunity to defend against the Trust Fund Taxes would have been to do nothing. (Defs.' Mot. Summary J. 14, dkt. 44.)

By letter dated November 28, 2008, RO Bryant notified Defendant Wilson that it had reviewed his "10/15/2008 protest" and found that he had not presented any new facts that would alter their previous decision, they were therefore forwarding his protest to the Appeals office for consideration. (IRS Letter, Nov. 28, 2008, dkt. 44-12.) On June 25, 2009, Defendant Wilson was notified that the Appeals section was returning the case to the Collection Area Director for assessment of the Trust Fund Taxes, an indication that Defendant Wilson's protest was denied. (IRS Letter, June 25, 2009, dkt. 44-13.) The Trust Fund penalties were assessed on July 2, 2009. (First Am. Compl. ¶ 24; J. Junior Decl. ¶ 4, dkt. 46-6.)

Defendants argue that equitable estoppel should be applied against the Government in this matter. "If a party claims the government is estopped from making an argument, summary judgment is appropriate in favor of the government if there is an insufficient

showing for any of the estoppel elements." *Michigan Express Inc. v. United States*, 374 F.3d 424, 426 (6th Cir. 2004) (citing *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir.1992)).While the Sixth Circuit recognizes estoppel as an equitable defense against the government, it is equally clear that the government "may not be estopped on the same terms as any other litigant" and "'[a] party attempting to estop the government bears a very heavy burden' in sustaining its argument." *Michigan Express*, 374 F.3d at 427 (citations omitted). "[T]he traditional elements of equitable estoppel are: (1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel." *Id.* In addition to the other estoppel elements, the party must also "demonstrate some 'affirmative misconduct' by the government." *Id.*; *see also United States v. Guy*, 978 F.2d 934, 937 (6th Cir. 1992). The Sixth Circuit found that "'affirmative misconduct' is more than mere negligence," "[i]t is an act by the government that either intentionally or recklessly misleads the claimant." *Michigan Express*, 374 F.3d at 427.

Defendants cite a Third Circuit case in which the court upheld the district court's finding of estoppel. In *Fredericks v. Commissioner*, the IRS took 14 years to decide if the taxpayer's tax-shelter deduction claimed in a 1977 tax return was appropriate. *See Fredericks v. Comm'r of Internal Revenue*, 126 F.3d 433 (3d Cir. 1997). The IRS represented to the plaintiff that it never received a Form 872-A from him, which authorized an indefinite extension of the statute of limitations, and was revocable. *See id.* at 435. Three years in a row, the IRS confirmed this misrepresentation "by soliciting and executing three separate Forms 872, which extend the statute of limitations for one year." *Id.* When the IRS discovered it possessed the Form 872-A, it relied on that form in continuing its

14

investigation and failed to notify the taxpayer of the change in its course of action; it then used the same form "to assess a deficiency in 1992, 11 years after informing the taxpayer that the Form 872-A did not exist, and eight years after the final one-year extension expired." *Id.* "Finally, the IRS imposed interest penalties totaling over five times the amount of the tax and covering the entire duration of its protracted investigation of the tax shelter." *Id.* The court found that the plaintiff had both proven the elements of equitable estoppel, as well as affirmative misconduct, calling it "the most impressive case for estoppel against the IRS that our research has disclosed." *Id.* at 435, 440, 441.

Plaintiff argues that these facts do not show misconduct. Plaintiff differentiates *Fredericks* by arguing that *Fredericks* relied on a mistake of fact. *Id.* at 444. Plaintiff argues that RO Bryant's representation, if, indeed, it was a misrepresentation and/or omission, involved an opinion of law, that the Trust Fund Taxes could not be assessed without the protest letter, which, Plaintiff argues, is without a legal basis.[7] *See e.g.*, *Haley v. I.R.S.*, 2006 WL 497232, at *3 (D. Md. Jan. 20, 2006) ( IRS could not locate the physical protest document, yet had evidence that he had filed a timely protest, thus extending the period of assessment; the court noted that there was "no support for the contention that either the loss of the protest document *per se*, or the IRS's ultimate decision to assess the penalty

---

[7] Plaintiff also argues that to the extent that internal operating procedures required that a copy of the first protest letter be provided to Appeals, such internal operating procedures do not have the effect of law, nor do they confer rights upon taxpayers. *See e.g., Valen Mfg. Co. v. United States*, 90 F.3d 1190, 1194 (6th Cir. 1996) ("The provisions of the [*Internal Revenue Manual*], however, only "govern the internal affairs of the Internal Revenue Service. They do not have the force and effect of law."); *but see U.S. v. McKee*, 192 F.3d 535, (6th Cir. 1999) (the court approving of circuits that have opined that "a taxpayer may challenge a conviction by relying on the Manual's provisions so long as the taxpayer's challenge was based on an alleged violation of a constitutional right").

without the document in its possession, violated [the taxpayer plaintiff's] due process rights"). Plaintiff also points out that the taxpayer in *Fredericks* lost a legal right as a result of the IRS's actions, the right to revoke the extension of the statute of limitations.

In reply, Defendants argue that they never contended that there were legal reasons the government could not proceed to assess the liabilities; rather, RO Bryant faced a "practical problem," he had been advised that without the protest, there was "no hope of evaluating the possibility of assessing [Defendant Wilson] at this time" and the government did not know how to proceed due to the lost file. (Defs.' Reply 7, dkt. 53.)

Plaintiff emphasizes the particularly high burden Defendants must meet, relying upon the Sixth Circuit's recent statement that "the Supreme Court has never upheld a finding of estoppel against the government." *Garavaglia v. C.I.R.*, 521 F. Appx. 476, 481 (6th Cir. 2013) (citing *OPM v. Richmond*, 496 U.S. 414, 422 (1990)). A review of the underlying Supreme Court decision relied upon by the Sixth Circuit, *OPM v. Richmond*, highlights this very proposition, despite the Court declining to adopt a sweeping rule that estoppel may not run against the government because they could decide that particular case on a narrower ground. *See Richmond,* 496 U.S. at 421-22 ("dicta in our more recent cases have suggested the possibility that there might be some situation in which estoppel against the Government could be appropriate" and noting that "Courts of Appeals have taken our statements as an invitation to search for an appropriate case in which to apply estoppel against the Government, yet we have reversed every finding of estoppel that we have reviewed"). The Court noted that it would "leave for another day whether an estoppel claim could ever succeed against the Government." *Id.* at 423.

The Third Circuit's decision in *Fredericks* was not appealed, as evidenced by the

16

IRS's Acquiescences/Non Acquiescences Announcement relating to the case, so the Court can do no more than speculate as to whether the Supreme Court would have upheld *Fredericks* as the premier circuit decision applying estoppel against the government. *See generally* 1998-35 I.R.B. 4 (IRS ACQ), 1998 WL 34028578; AOD-1998-04 (IRS AOD) 1998 WL 545877.

The facts in the present case are not as clear as *Fredericks* with respect to misrepresentation, and Defendants fail to plead affirmative misconduct. The Court cannot find that RO Bryant's communications were misconduct where there was no bar to assessing Defendant Wilson without the benefit of the first protest letter, or the submission of the second. The very evidence on which Defendant relies shows that the first protest was timely filed, and the fact that it went missing did not prevent the assessment statute expiration date (ASED) from being extended; the September 15, 2008 ICS History Transcript entry noted that the ASED "would not start to run again until Appeals actually finally makes a determination at which point the government has 30 days to finally assess the trust fund against Mr. Wilson." (ICS History Tr., dkt. 44-8.) Defendants fail to plead facts that, if taken as true, support an equitable estoppel defense against the government. Fed. R. Civ. P. 12(b)(6).  For these reasons, the Court denies Defendant's motion for leave to amend affirmative defenses as futile, as well as their motion for summary judgment as to both the equitable estoppel issue on the Trust Fund Taxes and on the issue of unclean hands, as these rely on the equitable estoppel argument stemming from RO Bryant's communications with Defendant Wilson and his attorney.

17

## B. Motions For Summary Judgment

### 1. Summary Judgment Standard Of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Rule 56 also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider

18

other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

### 2.  Defendants' Motion For Summary Judgment (Dkt. 44)

Defendants make three arguments in their motion for summary judgment. (Defs.' Mot. Summary J., dkt. 44.) First, they argue that the income tax and interest assessments from the year 2000 are barred by the statute of limitations. Next, they argue that Plaintiff is precluded from collecting the trust fund penalties alleged in Count II by the running of the statute of limitations and/or by the doctrine of equitable estoppel. Finally, they argue that Plaintiff's unclean hands and failure to do equity preclude it from obtaining equitable relief in the form of foreclosure.

### a.  Whether The Collection Of The Individual Income Taxes Is Barred By The Statute Of Limitations

Defendant argues that the collection of the individual income taxes is barred by a ten-year statute of limitations. 26 U.S.C. § 6502 provides that

> (a) Length of period.--Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun–
>
> (1) within 10 years after the assessment of the tax, . . . .

26 U.S.C. § 6502. The earliest of the income tax liabilities were assessed on October 2, 2000. (Am. Compl. ¶ 20.) Plaintiff concedes that the IRS did not seek to collect the back taxes within the original ten-year deadline. (Pl.'s Resp. 9, dkt. 50.) Plaintiff admits that the original collection statute expiration for this earliest assessment was October 2, 2010. (Pl.'s Resp. 12, dkt. 50.) Defendant argues that this expired on October 1, 2010, or December 10, 2010, for the portion of taxes assessed in December 2000. (Defs.' Mot. Summary J. 6, dkt. 44.)

Plaintiff argues that there are provisions that suspend or extend this statute of limitations and that three of these situations apply here: a taxpayer requests a collection due process hearing, the taxpayer submits an offer in compromise (OIC), and a taxpayer proposes an installment agreement.

Plaintiff argues that these events extended the collections period by 1,463 days, resulting in the earliest assessment expiring on October 4, 2014. (Pl.'s Resp. 12, dkt. 50.) Defendants argue that two of these events, the proposal for an installment agreement and the OIC, do not toll the statute of limitations in this case, and that, in any event, Plaintiff did not properly calculate the date.

With respect to the collection due process hearing (CDP) Plaintiff received the request for the due process hearing on September 6, 2005 and a decision was issued on November 7, 2008, as alleged by Plaintiff, a total of 1,158 days. (Pl.'s Resp. 10, dkt. 50; J. Junior Decl. ¶ 2, dkt. 50-3.) Defendants do not argue that the CDP hearing did not toll the statute.

   i.      **Offer In Compromise (OIC)**

20

Plaintiff alleges that Defendant Wilson's OIC for his income tax liabilities for tax years 1991 through 1994 was accepted for processing on October 24, 2007.[8] (Pl.'s Resp. 6, dkt. 50.) The IRS sent a letter dated May 27, 2008, rejecting Defendant's "offer dated 08/24/2007 in the amount of $1,000.00." (IRS Letter, May 27, 2008, dkt. 50-6.) Defendant Wilson timely appealed the finding in June 2008. (Young Letter, June 4, 2008, dkt. 50-6.) IRS Appeals denied the OIC on June 25, 2009. (IRS Letter, June 25, 2009, dkt. 50-7.) Because the OIC was submitted while the Tax Court case was pending, Plaintiff argues that the tolling period resulting from the OIC runs from the November 7, 2008 date of the Tax Court decision until June 25, 2009, the date Appeals denied the OIC, totaling 230 days. (Pl.'s Resp. 11, dkt. 50; C. Moore Decl., dkt. 50-4; IRS Form 656 Offer In Compromise, dkt. 50-5; J. Junior Decl., dkt. 50-3.)

Defendants' argument that the OIC did not toll the statute is premised on their analysis of 26 U.S.C. § 7122(a), which provides that

> (a) Authorization.--The Secretary may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General or his delegate may compromise any such case after reference to the Department of Justice for prosecution or defense.

28 U.S.C. § 7122(a). Defendants cite 26 C.F.R. § 301.7122-1(d)(2), which further provides that "[a]n offer to compromise becomes pending when it is accepted for processing. The IRS may not accept for processing any offer to compromise a liability following reference

---

[8]The declaration on which Plaintiff relies states that the Form 656, Offer In Compromise was "received by the IRS on October 12, 2007" and is stamped "RECEIVED IRS OCT 12 2007." (C. Moore Decl., dkt. 50-4; IRS Form 656 Offer In Compromise, dkt. 50-5; J. Junior Decl, dkt 50-3.)

of a case involving such liability to the Department of Justice for prosecution or defense."

Defendants argue that because the matter of Defendant Wilson's income taxes for 1991

through 1994 was referred to DOJ for prosecution in the late 1990's, the OIC could not

have been accepted for processing, nor could it have tolled the statute of limitations.

Plaintiff responds that pursuant to the *Internal Revenue Manual* (IRM), the IRS could

not proceed civilly until the criminal tax and/or related investigation was closed and the

referral to the DOJ terminated. I.R.M. pt. 9.5.14.1 *Closing Procedures*, 2007 WL 8444022.

The IRM provision assigns responsibility and procedures to "ensure that criminal tax and/or

tax related investigations are properly closed in order to allow civil tax enforcement

procedures to begin or resume." *Id.* (emphasis added). The IRM provides that

> IRS operating divisions may not proceed civilly until the criminal tax and/or tax related investigation is closed and any referral to the Department of Justice (DOJ) is terminated. Generally, termination of the referral is accomplished by a letter from DOJ. However, DOJ has delegated preparation of the letter terminating the referral from the IRS by way of the automatic closing procedures.
>
> (2) Department of Justice has agreed to immediate and automatic closing of the following tax and tax-related criminal investigations (both administrative and grand jury), without express written DOJ authorization:
>
> . . . .
>
> d) investigations where sentencing has occurred following the entry of a guilty plea

*Id.* While it appears that this authority may not have been available in the IRM until July 12,

2000, Plaintiff shows that a similar provision for automatic closing procedure was in effect

as of September 1998. *See* IRM (31)4(19)0 *Closing Criminal Tax Cases*, 1998 WL

35352468 ("A criminal referral is in effect until it is closed," providing for automatic closing

in "[c]ases where sentencing has occurred following entry of plea of guilty or nolo

contendere, if no motion for withdrawal of plea was made." ). Defendant Wilson pleaded guilty and received a sentence on November 30, 1999. (Criminal Case Judgment, Case No. CR 99-20038-BC-01, dkt. 50-2.) Under these provisions, the criminal case would have closed and civil enforcement would have begun or resumed.

The Court also considers and finds persuasive Plaintiff's argument that the OIC regulation specifically provides that even a "nonprocessable" OIC which is erroneously accepted for processing will suspend the statute of limitations.[9] 26 C.F.R. § 301.7122-1(d)(2).

In Reply, Defendants argue that the closing of a criminal case has no impact on OIC or installment agreements. Again, Defendants rely on 26 U.S.C. § 7122(a), yet the statute and code are silent to what happens *after* the criminal matter is closed and returns to the IRS.

The Court finds that reading the two provisions together, that which provides for automatic closing of criminal cases and that which contemplates that civil enforcement may "resume", is not inconsistent with the provisions cited by Defendants, which address the situation in which a case is referred to the Department of Justice "for prosecution or defense" but is silent as to civil enforcement after prosecution or defense end.

The Court finds that the OIC suspended the statute of limitations for an additional

---

[9] "The IRS may also return an offer to compromise a tax liability if it determines that the offer was submitted solely to delay collection or was otherwise nonprocessable. An offer returned following acceptance for processing is deemed pending only for the period between the date the offer is accepted for processing and the date the IRS returns the offer to the taxpayer." 26 C.F.R. 301.7122-1(d)(2) (emphasis added).

23

230 days and denies Defendants' statute of limitations argument as to the OIC.

### ii.   Proposal For Installment Agreement

Defendants make a similar argument that Defendant Wilson's proposal for installment agreement did not toll the statute of limitations. Plaintiff takes the position that the statute of limitations was tolled for 75 days while Defendant Wilson's installment payment agreement was pending.[10] (Pl.'s Responses to Interrogs. 1(a), dkt. 44-15.) 26 U.S.C. § 6159 governs agreement for payment of tax liability in installments. Like the OIC code provisions, Defendants point out that 26 C.F.R. 301.6159-1(b)(2) provides

> A proposed installment agreement becomes pending when it is accepted for processing. The Internal Revenue Service (IRS) may not accept a proposed installment agreement for processing following reference of a case involving the liability that is the subject of the proposed installment agreement to the Department of Justice for prosecution or defense. The proposed installment agreement remains pending until the IRS accepts the proposal, the IRS notifies the taxpayer that the proposal has been rejected, or the proposal is withdrawn by the taxpayer.

Like the OIC provisions, submission and acceptance of a proposed installment agreement for processing may suspend the statute of limitations. 26 U.S.C. § 6331(k)(2) (levy and distraint, disallowing levy "during the period that an offer . . . for an installment agreement . . . is pending," and, if rejected, "during the 30 days thereafter (and, if an appeal of such rejection is filed within such 30 days, during the period that such appeal is pending)"); and

---

[10]Plaintiff in its responses to interrogatories explained that the IRS received the proposed installment agreement (IA) on January 19, 2011, and on March 4, 2011, it notified Defendant Wilson via letter that the proposed installment agreement was rejected. Plaintiff's response states that the statute of limitations is suspended from the date the IRS received the proposed IA and during the 30 days after the IRS notifies the defendant of the rejection, citing 26 U.S.C. § 6331(i)(5) and 6331(k)(2) and 26 C.F.R. § 301.6331-4(a)(2).  (Pl.'s Responses to Interrogs. 1(a), Ex. N, dkt. 44-15.) The Court finds that the calculation of 75 days is correct pursuant to 26 U.S.C. § 6331(k)(2).

§ 6503(a)(1) ("running of the period of limitations provided in section . . . 6502 . . . on the making of assessments or the collection by levy or a proceeding in court, . . . , shall . . . be suspended for the period during which the Secretary is prohibited from making the assessment or from collecting or a proceeding in court . . ., and for 60 days thereafter.").

Like the analysis above with respect to OIC, Defendants' position creates a tension between the provision that provides that a criminal case automatically closes and the civil enforcement may begin or "resume" and provisions that provide that the "Internal Revenue Service (IRS) may not accept a proposed installment agreement for processing following reference of a case involving the liability that is the subject of the proposed installment agreement to the Department of Justice for prosecution or defense." The Court denies Defendants' motion for summary judgment on the issue of statute of limitations as to the individual income tax liability, finding that the statute was tolled for those periods when Defendant sought the due process hearing (which followed the automatic closure of the criminal case), and while the OIC and the proposal for installment agreement were accepted for, and treated as if they were in, processing.[11]

---

[11] In their reply, Defendants rely on Internal Revenue Manual provisions to argue that the procedures set forth therein contradict the government's position that a nonprocessable OIC can erroneously be accepted for processing, as can the proposal for installment agreement. (Defs.' Reply, dkt. 53.) The Court notes that "[t]he provisions of the manual, . . . only 'govern the internal affairs of the Internal Revenue Service. They do not have the force and effect of law.'" *Valen Mfg. v. U.S.*, 90 F.3d 1190, 1194 (6th Cir. 1996)(citations omitted); *but see U.S. v. McKee*, 192 F.3d 535, 540-41 (6th Cir. 1999)("we believe that the Manual's provisions are, at the very least, relevant in determining whether a taxpayer's constitutional rights have been offended"). The finding above rests on the close of the criminal case with the sentencing, and the return of the case to the IRS for civil enforcement, surely not without giving the IRS the ability to utilize the tools within its collections toolbox, including installment agreements and OICs.

25

The Court need not reach Plaintiff's argument that even if processing of the proposal for installment agreement were erroneous, the acceptance for processing should have suspended the statute of limitations as provided in the regulations for erroneous OIC processings.[12]

### iii.    Whether Plaintiff Correctly Calculated The Tolling Days

Finally, Defendants argue that even if the OIC and proposed installment agreement tolled the statute of limitations, the Government did not correctly calculate the time and its Complaint was not timely. Plaintiff filed its Complaint on October 3, 2014. By Plaintiff's calculation, its statute of limitations expired on October 4, 2014. (Defs.' Mot. Summary J. 11, dkt. 44; Pl.'s Resp. 12, dkt. 50 .)

First, Defendants argue that Plaintiff stated that Defendant Wilson was advised on March 4, 2011, that his installment agreement was rejected and the statute of limitations was tolled for 30 days thereafter. 26 U.S.C. § 6331(i)(5), 6331(k)(2). Defendants argue that the "30 day period would expire in April 3, 2011," and that the Plaintiff incorrectly concluded that "30 days after March 4, 2011 is April 4, 2011. They argue that this resultant calculation is 74 days, not 75 days related to the installment agreement proposal.

Plaintiff admits making an error in its response to Defendants' Interrogatory 1(a) when it explained 26 U.S.C. § 6331(k)(2)(B). (Pl.'s Resp. 18, dkt. 50.)  Plaintiff explains in

---

[12]Unlike the OIC code provisions, Plaintiff admits that the installment agreement regulation lacks a specific procedure for a non-processable installment agreement that has been erroneously accepted for processing. *See e.g.*, 26 C.F.R. 301.7122-1(d)(2). But, argues Plaintiff, the OIC and installment agreement regulations contain similar language prohibiting the IRS from "accepting for processing" the OIC or installment agreement for liabilities that have been referred to DOJ, therefore the "implication" is that a proposed installment agreement erroneously accepted is not a nullity and is likewise "pending" for purposes of suspending the statute of limitations.

the Response that "the statutes of limitations were suspended from the date that the IRS received the proposed installment agreement *plus* 30 days after notifying Richard Wilson of the rejection. In other words, the statutes of limitations were suspended until the 31st day after notification of the rejection because the IRS was prohibited from levying on Richard Wilson's assets in the 30 day period following the rejection." (*Id.*) The Court finds that the IRS notified Defendant Wilson of the rejection on March 4, 2011, the 30 day period commenced "thereafter" on March 5, during which time no levy could be made, in addition to the initial 45 days, for a total of 75 days. *See* 26 U.S.C. § 6331(k)(2).

Defendants also allege that Plaintiff miscalculated the tolling period related to the OIC. Plaintiff states the offer was rejected on June 25, 2009. Defendant argues that documents produced by the Government show that the offer was rejected on June 1, 2009. (Defs.' Mot. Summary J. 12, dkt. 44; dkt. 44-16.) Defendant Wilson relies on internal notes dated June 18, 2009 that state the following: "Per Emails rec'd from the ATM, he approved the Form 5402 and OIC rejection letters on 6/1/2009 while I was on leave. Applied the ATM signature stamp to the Form 5402 and OIC rejection letter per his directive. . . . " (*Id.*)

Form 656, which was signed and submitted by Defendant Wilson states that "[t]he offer [of limitations] remains pending until an authorized IRS official accepts, rejects, returns or acknowledges withdrawal of the offer in writing. If I/we appeal an IRS rejection decision to the offer, IRS will continue to treat the offer as pending until the Appeals Office accepts or rejects the offer in writing." (Form 656, at 2 (section 5(k)), dkt. 50-5.) The letter from the Appeals Office to Defendant Wilson is dated June 25, 2009, stating that his "offer rejection is sustained . . . ." (IRS  Letter, June 25, 2009, dkt. 50-7.) Despite the June 18, 2009 notation that someone had "approved" a form and the rejection letter, which still needed

27

a signature stamp and to be sent, there is no evidence that there was a rejection of the offer to be relied upon other than that dated and sent to Defendant Wilson. Defendants did not provide evidence to raise a dispute as to when there was a rejection of Defendant Wilson's OIC in writing; nor did they provide evidence to raise a dispute that the date for calculation was other than the date that appears on the June 25, 2009 letter to Defendant Wilson. The Court finds that Plaintiff correctly calculated the tolling periods in both instances: For the proposed installment agreement and the OIC.

   **b.  Whether Plaintiff Is Precluded From Assessing Trust Fund Penalties Pursuant To Statute Of Limitations Or Equitable Estoppel**

Defendants argue that the assessment is barred by the statute of limitations. 26 U.S.C. § 6501 provides that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) . . . , and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period." Defendants argue that the tax returns were filed in June of 2000 and the obligations were not assessed until July 2009, over nine years later. As set forth above, however, the parties agree that Defendant Wilson filed a protest in 2001. Defendants argue that the government considered the new protest filed in 2008 and the rejection made no mention of the 2001 protest. (IRS Letter, Nov. 28, 2008, dkt. 44-12.) Without citation to legal authority in support, Defendants argue that the "facts of this case render the original Protest a nullity." Defendants' admit that 26 U.S.C. § 6672 provides that a "timely" protest extends the statute of limitations. There is no question of fact that the 2001 Protest was determined and treated as timely. It thus tolled the statute of limitations. Defendants cite no legal support for their argument to the

contrary.

For the reasons set forth above, the Court denies Defendants' equitable estoppel argument based on RO Bryant's communications. The Court denies Defendants' motion as to the Trust Fund Penalties.

### c.   Whether Unclean Hands and/or Failure To Do Equity Preclude Plaintiff From Obtaining Equitable Relief In The Form Of Foreclosure

For the reasons set forth above, the Court will deny Defendant's claims based on equitable estoppel and/or unclean hands. Even if the Court did not deny this claim, Plaintiff argues that it would not apply to Defendant Wilson's individual income tax liabilities, which are unrelated to the alleged misconduct of RO Bryant, citing *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365 (6th Cir. 1977). The *Kearney* court noted that "(f)raud or unclean hands are not to be lightly inferred. They must be established by 'clear, unequivocal and convincing' evidence," going on to find that "[a] further requirement for application of the clean hands doctrine is that the wrongful conduct be directly related to the matter in litigation." *Id.*

The Court denies Defendants' motion for summary judgment.

29

### 3.    Plaintiff's Motion For Summary Judgment (Dkt. 46)

Plaintiff brings a motion for summary judgment on the following issues: Whether res judicata precludes Defendant Wilson from re-litigating the validity of the assessment for income tax years 1991 though 1994; whether Defendant Wilson is liable for Trust Fund recovery penalties for quarterly tax periods ending on March 31, 1995 through June 30, 1997, and December 31, 1997, through December 31, 1998; whether the government is entitled to enforce federal tax liens against the Holly Property where the R and J Family Limited Partnership holds record title to the property as Defendant Wilson's nominee; and whether the government is entitled to enforce federal tax liens against the Carleton Property where the Simpson Wilson Family Limited Partnership holds record title to the property as Defendant Wilson's nominee.

> **a.    Whether res judicata precludes Defendant Wilson from re-litigating the validity of the assessment for income tax years 1991 though 1994, because he previously challenged those assessments in the United States Tax Court and the Tax Court entered judgment in favor of the government.**

Plaintiff argues that it is entitled to judgment with respect to Defendant Wilson's income tax liabilities, including penalties and interest, for tax years 1991 through 1994 because Defendant Wilson is barred by res judicata from re-litigating the validity of these assessments.

> Under the doctrine of res judicata, also known as claim preclusion, a party is precluded from bringing a claim when there exists
> (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies[';] (3) an issue in the subsequent action which was litigated or should have been litigated in the prior action; and (4) an identity of the causes of action.

*Golden v. C.I.R.*, 548 F.3d 487, 494 (6th Cir. 2008) (citation omitted). "In the tax context,

30

'if a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is res judicata as to any subsequent proceeding involving the same claim and the same tax year.'" *Id.* at 494-95 (quoting *Comm'r v. Sunnen*, 333 U.S. 591, 598 (1948)). "[R]es judicata binds the parties 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" *Id.* (quoting *Sunnen*, 333 U.S. at 597).

On March 8, 2007, Defendant Wilson filed a petition in the United States Tax Court, disputing the amounts of penalties and/or additions for taxes assessed for tax years ending 1991 through 1994.[13] (U.S. Tax Court Petition, March 8, 2007, dkt. 46-8.) The Tax Court entered a decision dated November 7, 2008, finding that "the determinations set forth in the Notice of Determination Concerning Collection Action(s) under Section 6320 and/or 6330 issued to petitioner on February 12, 2007, for petitioner's income tax liability for the taxable years 1991, 1992, 1993, and 1994, and upon which this case is based, are sustained in full." (U.S. Tax Ct. Decision, docket no. 5576-07L, Nov. 7, 2008, dkt. 46-9.)

First, as Plaintiff points out, the Tax Court case involved the same parties: Defendant Wilson and the United States (Commissioner of Internal Revenue). Next, the claims and years were the same. Defendant Wilson challenged the validity of assessed penalties and interest for the income tax years 1991 through 1994. It is the third element with which

---

[13] There, Defendant Wilson argued that with the earlier plea agreement, the parties had agreed that funds seized from Defendant had already been credited to his tax liabilities for years 1991 through 1993, and the effect was to eliminate tax deficiencies for 1991, 1992 and 1993, with no penalties or interest due. He also argued that penalties and interest for 1994 were improperly calculated due to the failure to recognize this application of the seized funds. (U.S. Tax Ct. Pet., Dkt. 46-8.)

Defendants take issue, arguing that the Tax Court did not enter a final judgment.[14] (Defs.' Resp. 9, dkt. 49.) Yet the Tax Court decision was stipulated, as stated at the bottom of the decision and the following signature page.  (U.S. Tax Ct. Decision, docket no. 5576-07L, Nov. 7, 2008, dkt. 46-9.) "For purposes of res judicata, a stipulated decision 'has the full effect of final judgment.'" *Golden*, 548 F.3d at 495 (citing *Blakely v. United States*, 276 F.3d 853, 866 (6th Cir. 2002)). Finally, Plaintiff correctly points out that Defendant Wilson had the opportunity to litigate the 1991 through 1994 income tax assessments and any arguments challenging the validity of those assessments should have been raised at that time. The Court finds that the conditions for res judicata are present with respect to the assessment for income tax for years 1991 through 1994.

Defendants also argue that Plaintiff's pleadings raise genuine issues of fact concerning the amounts due: the Amended Complaint seeks $1,111,097.80 as of July 31, 2014, and Plaintiff's Motion for Summary Judgment seeks less than $1,000,000 as of December 2015. (Defs.' Resp. 9, dkt. 49; Am. Compl. ¶ 20; M. Echols Decl. dkt. 46-5; J. Junior Decl., dkt. 46-6.) Plaintiff replies and acknowledges that the unpaid balance provided in the motion for summary judgment for tax year 1991 was inaccurate, the government erroneously stated that the balance was only $257,949.96 as of December 1, 2015, however, the balance due was actually $405,056.30 as of that date. (Pl.'s Reply, dkt. 51; J. Junior Decl., dkt. 51-2.) The declaration of Plaintiff's employee explains that the discrepancy was the result of the necessity to manually calculate the accrued interest for

---

[14]     Defendants also argue that because Plaintiff did not timely reduce the tax liabilities to judgment, its claim under Count I is barred by the statute of limitations. Defendants' statute of limitations arguments were fully considered with their motion for summary judgment as set forth above.

tax year 1991. (*Id.*) Plaintiff argues that interest is "merely a statutory addition" and does not create a dispute of fact to preclude summary judgment. Aside from their argument related to the statute of limitations, Defendants introduce no evidence that Defendant Wilson does not owe the stated amount and the Court finds no genuine issue of material fact with respect to the amount owing.

The Court finds that Plaintiff is entitled to judgment against Defendant Wilson with respect to the unpaid income tax liabilities, including interest and penalties, for tax years 1991 through 1994, in the amount of $1,147,016.03 plus statutory additions from and after December 1, 2015, including interest.

>   **b.    Whether Defendant Wilson is liable for Trust Fund recovery penalties related to the wages of the employees of the Collision Shop Inc. for quarterly tax periods ending on March 31, 1995, through June 30, 1997, and December 31, 1997, through December 31, 1998.**

Plaintiff also argues that it is entitled to summary judgment with respect to the trust fund recovery penalties assessed against Defendant Wilson. Plaintiff cites *Sinder v. United States*, 655 F.2d 729, 731 (6th Cir. 1981), to argue that IRS assessments against taxpayers under 26 U.S.C. 6672 – trust fund recovery penalties– are presumed correct. (Pl.'s Mot. For Summ. J.) Plaintiff then states that "in a suit to reduce such assessments to judgment, the taxpayer carries the burden of proving the assessment was wrong by a preponderance of the evidence," citing *Calderone v. United States. Calderone v. United States*, 799 F.2d 254 (6th Cir. 1986) (citing *Sinder*, 655 F.2d at 731). *Sinder* provides that

>   When a party pays part of the penalty existing for failure to pay withheld taxes and the government counterclaims for the remainder of the refund, the taxpayer has the burden of proving that the assessment was wrong. The assessment is presumed to be correct. Therefore, the taxpayer has the

33

burden of showing that he was not a responsible party on both the refund claim and the counterclaim.

*Sinder*, 655 F.2d at 731 (emphasis added). Sinder arose in the context of a taxpayer seeking refund, however its holding regarding burden has been applied in other contexts. "If an assessment is made against a corporate officer, the burden of proof by a preponderance of the evidence is on the officer to show that he was not a responsible person or that he did not act willfully." *Cline v. United States*, 997 F.2d 191, 194-95 (6th Cir. 1993) (citing *Calderone*, 799 F.2d at 258 (quoting *Sinder v. United States*, 655 F.2d 729, 731 (6th Cir.1981)).

"Section 6672 provides that 'any person' who willfully fails to account for and pay over withholding taxes shall be liable for the full amount not paid over to the government. Liability attaches if an individual meets two requirements. He must be a 'responsible person' under the statute, and he must 'willfully' fail to pay over to the government the amount due." *Gephart v. U.S.*, 818 F.2d 469, 473 (6th Cir. 1987) ("Congress enacted section 6672 to protect the government against losses by providing it with another source from which to collect the withheld taxes.")

In the Response, Defendant Wilson "concedes for purposes of this motion that he is a responsible person". (Defs.' Resp. 11, dkt. 49.)  Defendants argue, however, that Defendant Wilson did not wilfully fail to account for or pay over any taxes, and that, at the very least, genuine issues of material fact exist.

"A failure to pay over taxes is willful, for section 6672 purposes, if it is voluntary, knowing and intentional even though it is not done with a bad purpose or an evil motive.... One who pays other creditors, rather than pay withholding taxes to the government, is liable

34

for a willful failure to pay such taxes...." *Calderone*, 799 F.2d at 259 (citation omitted). "More than mere negligence is required for 'willfulness'; a person is not 'willful' if as a result of negligence he is unaware of the default in the payment of payroll taxes.... But willful conduct may also include 'a reckless disregard for obvious or known risks.' ...." *Calderone*, 799 F.2d at 259-60 (citation omitted).

In June 2000, Defendant Wilson filed Forms 941 on behalf of Collision Shop, Inc., for several tax periods/quarters that ended between March 31, 1995 and December 31, 1998. (Form 941, dkt. 46-16; R. Wilson Dep. 93-94, dkt. 46-2.) Defendants correctly point out that there is no evidence presented that Defendant Wilson actually knew that withholding taxes were not being paid in full and timely. Plaintiff primarily argues that because of the IRS raid, because Defendant Wilson knew about the IRS investigation for failing to pay his taxes, and because he failed to ensure that the Forms 941 were timely filed, he acted with knowledge or reckless disregard as to whether the trust fund taxes were being paid. (Pl.'s Mot. Summary J. 25, dkt. 46.) Plaintiff relies on *Cooper v. United States*, 827 F. Supp. 1309, 1314 (E.D. Mich. 1993), to argue that following the IRS raid, Defendant Wilson knew that he could not rely on his subordinates to ensure that the trust fund taxes were fully paid. Yet in *Cooper*, the taxpayer had knowledge that it was specifically the withholding taxes that were delinquent– she had terminated a prior employee for failing to pay them– so the court determined that her subsequent failure to correct this mismanagement was "willful conduct for purposes of section 6672." *Cooper*, 827 F. Supp. at 1314. The court then found a genuine issue of material fact where the government failed to present any evidence to show the taxpayer had knowledge of unpaid withholding taxes before a specific date at a related corporation. *Id.*

35

In his testimony Defendant Wilson agreed that the managers and secretaries paid the federal tax deposit for the payroll taxes and had always had that responsibility. (R. Wilson Dep. 115:23-116:14, dkt. 46-2.) With respect to the 941 Forms, Defendant Wilson testified:

> "[I]n 2000, you're going to knock me over with a feather that the 941s or this came up deficient. I wanted to make sure that everything was in compliance. Did I let the 941s slip or go unnoticed, obviously, I must have. I thought all the taxes were being paid to a T. But the 941 reports didn't get filed until 2000."

(R. Wilson Dep. 117:18-24, dkt. 46-2.) Plaintiff argues that as president and owner, Defendant Wilson cannot escape liability by relying on the mistaken belief that subordinates were fully paying the trust fund taxes as they became due. *See Conway v. United States*, 647 F.3d 228, 237 (5th Cir. 2011) ("Noting that corporate officers have a duty to ensure that payment is made, we have repeatedly rejected the argument that a taxpayer's good faith belief that payment for the taxes had been arranged is a defense to personal liability under § 6672," yet also noting that it was "sufficient that other creditors were consciously preferred to the United States").

Plaintiff also argues that in the protest letter dated October 15, 2008, signed by Defendant Wilson's attorney, it was noted that as provided in the plea agreement, Defendant Wilson had failed to file forms 1040 for the years 1991 through 1994, and that during the ensuing years "it was unknown whether the government could claim that by virtue of failing to file corporate tax returns, among other things, the Collision Shop, Inc., should be ignored as a separate taxpayer and treated as the alter ego or nominee of Richard Wilson. . . . For this reason, taxpayer would not allow the Collision Shop Inc. to file tax returns until completion of the criminal matter." (Young Letter 6-7, Oct. 15, 2008, dkt.

36

46-17.) Within the same letter, the attorney noted that the "undersigned is an authorized representative of the Taxpayer. An executed Form 2848 is on file with the Internal Revenue Service." (Young Letter 2, Oct. 15, 2008, dkt. 46-17.) Plaintiff correctly notes that this was a statement by Defendant Wilson's attorney within the scope of his representation and is an admission of the defendant-taxpayer. *See United States v. Dolleris*, 408 F.2d 918, 921 (6th Cir. 1969). Defendant Wilson testified that he does not remember prohibiting Collision Shop Inc. from filing a tax return while he was under criminal investigation. (R. Wilson Dep. 112:3-10, dkt. 46-2.)

"When the moving party does not have the burden of proof on the issue [as here], he need show only that the opponent cannot sustain his burden at trial." *Calderone v. United States*, 799 F.2d at 259 (citing W. Schwarzer, *Summary Judgment Under The Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). This case is not unlike *Calderone* (or even *Cooper*), where the Court found that disputed issues of material fact existed as to whether the taxpayer deliberately or recklessly disregarded the facts and known risks that the withholding taxes were not being paid and as to whether the tax payer was actually aware that the taxes were not being paid. While Plaintiff argues that Defendant Wilson acted recklessly because he already had knowledge that he was under investigation by the IRS, Defendant Wilson has raised genuine issues of fact related to that presumption, including that the raids were unrelated to the business taxes or payment of withholding taxes. Plaintiff has not shown that Defendant Wilson cannot sustain his burden at trial.[15]

---

[15] To the extent that Defendants also rely upon their statute of limitations and estoppel arguments, the Court denies those for the reasons set forth above.

37

    **c.**    **Whether the government is entitled to enforce federal tax liens against the Holly Property where the R and J Family Limited Partnership holds record title to the property as Defendant Wilson's nominee.**

Plaintiff seeks to enforce the tax liens against the Holly and Carleton Properties. Plaintiff argues that the partnerships by which they are held are mere nominees of Defendant Richard Wilson, who is the true owner of the Properties. In response to the federal tax liens, Defendants argue that neither of the partnerships are nominees and that genuine issues of material fact preclude ordering a foreclosure sale on the Properties.

"Under federal tax law, the Internal Revenue Service may collect the tax debts of a taxpayer from the assets of his nominee, instrumentality, or alter ego." *Porta-John of America, Inc. v. United States*, 4 F. Supp. 2d 688, 700 (E.D. Mich. 1998) (Edmunds, J.) (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350–51 (1977)).

> In order to establish that property is held by a nominee, the Court must consider six factors: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

*Porta-John*, 4 F. Supp. 2d at 701 (citing *Libutti v. United States*, 968 F.Supp. 71, 76 (N.D.N.Y.1997); *Towe Antique Ford Foundation v. IRS*, 791 F.Supp. 1450, 1454 (D.Mont.1992), aff'd, 999 F.2d 1387 (9th Cir.1993)); *see also U.S. v. Porath*, 764 F.Supp.2d 883 (E.D. Mich. 2011) *aff'd*, 490 F. App'x 789 (6th Cir. 2012) (applying *Porta-John's* six factors; "not all six factors are equally pertinent in every case"); *Spotts v. United States*, 429 F.3d 248 (6th Cir. 2005).

In applying the first of the six factors to the Holly Property, Defendant Wilson testified that he quit claimed the Holly Property to The R and J Family Limited Partnership for no consideration; this is reflected on the quit claim deed. (R. Wilson Dep. 127:6-20, dkt. 46-2; Quit Claim Deed Holly Prop., dkt. 46-18.) Second, Plaintiff correctly points out that the Holly Property was transferred in June 1996, less than six months after the IRS raided Defendant Wilson's home and businesses, when Defendant Wilson would have known that he would be facing litigation or liability for unpaid federal taxes. (Quit Claim Deed Holly Prop., dkt. 46-18.)

Third, there is a close relationship between the nominee and the transferor. Defendant Wilson agreed that it was his testimony that The R and J Family Limited Partnership was established for his mother, with his attorney Mr. Young's help, and he transferred the property to the Partnership to protect his mother's assets. (R. Wilson Dep. 127:6-20, dkt. 46-2.) According to Defendant Wilson's testimony, The R and J Family Limited Partnership was owned by Defendant Wilson, as general partner, and his mother, as limited partner. When his mother passed away, the Julia M. Wilson Revocable Trust ("JW Trust") became owner of her portion of The R and J Partnership, as limited partner. (R. Wilson Dep. 173-174, dkt. 46-2.) The trustees for his mother's trust, the JW Trust, are Defendant Wilson and his wife, Defendant Carrie Wilson. (R. Wilson Dep. 128:3-21, dkt. 46-2; JW Trust Decl. 26, dkt. 46-21.) Defendant Wilson is the designated beneficiary of the JW Trust's interest in The R and J Family Limited Partnership. (JW Trust Decl. 6, dkt. 46-21.) The evidence establishes a close relationship between the nominee and the transferor, and shows that the transferor remains in control of the partnership. The first three factors weigh in the government's favor.

39

Fourth, Defendant Wilson recorded his conveyance of the Holly Property to The R and J Family Limited Partnership. While this factor may weigh slightly in Defendant Wilson's favor, the fifth and sixth factors show that despite the recording of the quit claim deed, Defendant Wilson retains possession of the Holly Property and continues to enjoy the benefits of the transferred property. Both Defendant Wilson and his wife, Defendant Carrie Wilson, testified that they live at the Holly Property rent free, and have done so since 1998. (C. Wilson Dep. 50:23-51:2, dkt. 46-13.) Plaintiff also argues that evidence shows that the partnership is a sham. Defendant Wilson has testified that The R and J Family Limited Partnership holds only the record title to the Holly Property. It does not have any bank accounts, has not received any income and does not file tax returns.

Defendants argue that the government's nominee analysis and arguments are incomplete and fundamentally flawed; they criticize Plaintiff's failure to consider the history of each property. With respect to the Holly Property, Defendants argue that this was a family house owned by Defendant Wilson's mother and used for years as a vacation home. There were a series of transactions by Julia's attorney, Mr. Horvath, before the Property was briefly titled in Defendant Wilson's name. Defendants argue that JW Trust now owns 80% of The R and J Family Limited Partnership and Defendant Wilson's interest is limited to only 20%. They argue that JW Trust "does contain provisions for Richard's benefit; however, Richard has no right to any such benefits." (Defs.' Resp. 15.) They further argue that the "trustee has discretion to distribute income and/or principal to Richard" and has the power, but not the obligation to transfer interests and/or benefits from the trust." These arguments appear to ignore the fact that Defendant Richard Wilson and his Wife Carrie Wilson are the Trustees of JW Trust.

40

For these reasons, the Court finds that The R and J Family Limited Partnership is Richard Wilson's nominee and the federal tax liens attach to the property.

> **d.   Whether the government is entitled to enforce federal tax liens against the Carleton Property where the Simpson Wilson Family Limited Partnership holds record title to the property as Defendant Wilson's nominee.**

The Court applies the same nominee analysis factors to the Carleton Property. The nominee factors as to the Carleton Property do not favor Plaintiff as strongly as they did with respect to the Holly Property. The Carleton Property had been owned by Defendant Carrie Wilson's parents since the 1960's. In June 2001, Carrie's parents transferred the Carleton Property to Defendants Richard and Carrie Wilson by quit claim Deed; Defendant Carrie Wilson's mother, Jean Wilson, retains a life estate in the Carleton Property. (Quit Claim Deed Carleton Prop., dkt. 49-8; C. Wilson Dep. 85:5-19, dkt. 46-13.)

First, like the Holly Property, there is no dispute that Defendant Wilson quit claimed his interest in the Carleton Property to the Simpson Wilson Family Limited Partnership for no consideration. (R. Wilson Dep. 93:25-94:4, dkt. 46-2; Quit Claim Deed Carleton Prop. Aug. 25, 2005, dkt. 46-22.) Second, as Plaintiff points out, Defendant Wilson transferred the Carleton Property in August 2005, which is after he had been assessed on the 1991-1994 income taxes. Yet despite Plaintiff's position on this, the latest of those assessments was in March 2003, the earliest in October 2000. In this instance, waiting for between two and five years to transfer the property does not support a close connection between the lawsuit or liability and the purpose of the transfer. Further, Carrie's parents quit claimed the property to her and Richard in June 2001. Income taxes and interest for years 1991 through 1994 had been assessed in October 2000; if there were an intent to shield the

Carleton Property from the tax liabilities, Carrie's parents could simply have not transferred it. This factor is neutral.

Third, the alleged nominee, Simpson Wilson Family Limited Partnership has only two partners: Defendant Carrie Wilson, general partner, and Defendant Wilson, limited partner. (C. Wilson Dep. 93:25-94:8, dkt. 46-13.) Carrie holds 99 percent and Defendant Wilson holds one percent. (*Id.*) There is a close relationship between Defendant Wilson and the nominee. This factor weighs in favor of Plaintiff.

Fourth, as with the Holly Property, the conveyance was recorded. The fifth and sixth factors also weigh in favor of Defendants. Testimony shows that Defendant Wilson does not and has never resided at the Carleton Property. Defendant Carrie Wilson was raised in the house, her mother reserved a life estate in the property and her sons live there now. (C. Wilson Dep. 87:4-5, dkt. 46-13.) Aside from a 1% interest in the Simpson Wilson Family Limited Partnership, there is no evidence that Defendant Wilson retains possession of or exercises control over the Carleton Property. Similarly, there is no evidence that Defendant Wilson received a benefit from the Carleton Property. Simpson Wilson Family Limited Partnership holds only the Carleton Property; it has no other assets, generates no income and has no expenses. (C. Wilson Dep. 93:14-24, dkt. 46-13.)

The issues related to the Carleton Property are inappropriate for summary judgment where there exist genuine issues of fact as to whether the Simpson Wilson Family Limited Partnership is a nominee of Defendant Richard Wilson.

> **e.    Defendant's argument/defense: Whether the Court should exercise discretion and refrain from ordering a foreclosure sale if Simpson Wilson and R and J are found to be nominees and/or where rights of third-parties are involved.**

Defendants argue that the rights of "innocent third parties" are involved in the decision to allow a foreclosure sale. Jean Simpson holds a life-estate in the Carleton Property, which Defendants argue is superior to the tax lien. Defendants provide a calculation whereby the Carleton property is worth no more than about $115,000 and after deducting the value of Defendant Carrie Wilson's improvements to the property and her 50% interest, the value of Jean Wilson's life estate, and the costs of a sale, Plaintiffs would realize about $4,000 on the sale. And if sold, Defendant Carrie Wilson's sons who are currently living at the Carleton Property, one of whom is disabled, would have nowhere to live. With respect to the Holly Property, Defendants argue that Defendant Carrie Wilson spent "well over $100,000" repairing it after a tornado, as supported by her testimony and ledger of expenditures.

Defendants argue that a foreclosure sale is not proper pursuant to the factors set forth in *United States v. Rodgers*, 461 U.S. 677 (1983). *See United States v. Rodgers*, 461 U.S. 677 (1983) (factors to take into account when rights of third-parties would be unduly harmed by the sale). In *Rodgers*, the Court recognized that 26 U.S.C. § 7403, under which the government may initiate suit to enforce a lien to satisfy such tax or liability, must be read "to contemplate, not merely the sale of the delinquent taxpayer's own interest, but the sale of the entire property . . ., and the recognition of third-party interests through the mechanism of judicial valuation and distribution." *Rodgers*, 461 U.S. 677, 693-94 (1983). "To the extent that third-party property interests are 'taken' in the process, § 7403 provides compensation for that 'taking' by requiring that the court distribute the proceeds of the sale 'according to the findings of the court in respect to the interests of the parties and of the

43

United States.'" *Id.* at 697-98. The *Rodgers* Court recognized that "district courts may exercise a degree of equitable discretion in § 7403 proceedings," taking into account "both the Government's interest in prompt and certain collection of delinquent taxes and the possibility that innocent third parties will be unduly harmed by that effort." *Id.* at 709.

The *Rodgers* Court set forth four factors the court should take into account when deciding whether to proceed with a foreclosure sale when the rights of third parties are at issue. First, "a court should consider the extent to which the Government's financial interests would be prejudiced if it were relegated to a forced sale of the partial interest actually liable for the delinquent taxes." *Id.* at 710. "Second, a court should consider whether the third party with a non-liable separate interest in the property would, in the normal course of events (leaving aside § 7403 and eminent domain proceedings, of course), have a legally recognized expectation that that separate property would not be subject to forced sale by the delinquent taxpayer or his or her creditors." *Id.* at 710-11. "If there is no such expectation, then there would seem to be little reason not to authorize the sale." *Id.* at 711. "Third, a court should consider the likely prejudice to the third party, both in personal dislocation costs and in . . . practical undercompensation . . . ." *Id.* at 711. "Fourth, a court should consider the relative character and value of the non-liable and liable interests held in the property . . . ." *Id.*  The Court agrees with Plaintiff that with respect to the Holly property restitution interest is not contemplated under *Rodgers*, especially under the second factor, and that at most, Defendant Carrie Wilson would have an equitable lien for the value of improvements.

Defendants also argue that Defendant Carrie Wilson has a restitution interest in each property, arising under Michigan law for improvements that are innocently and

44

mistakenly made by one upon land under a mistaken claim of ownership, citing 25 MLP 2d, Real Property, § 150 "Restitution for Improvements." (Dkt. 49 at 19.)  With respect to the Holly Property, Defendant Carrie Wilson argues that she expended more than $100,000 on the Holly Property, including thousands of dollars spent for improvements following a tornado. (Dkt. 49 at 19.) Yet Defendants concede that "she did not believe she was an owner of the Holly Property." (Defs.' Resp. 19, dkt. 49.) For this reason, and as stated above with respect to the nominee analysis for the Holly Property, Defendants' argument that she is entitled to restitution is considerably less persuasive as to the Holly Property than the Carleton Property. With respect to the Carleton Property, she argues that she "is the owner of at least a 50% interest in the Carleton Property that is not subject to any tax lien" and that she has a "restitution interest arising from" the more than $50,000 she paid to improve the Carleton Property. (Dkt. 49 at 18.)        .

The Court agrees that the *Rodgers'* factors do not favor exercising discretion to prevent the sale of the Holly property. Further, Defendant has provided no legal analysis or direct legal support, short of the general citation to Michigan Law & Practice, for the premise that the Court should order restitution on the Holly Property improvements. Plaintiff does not show how these improvements were made under a mistake of ownership, or have otherwise created some sort of lien on the Holly Property. The Court need not reach this issue on the Carleton Property where questions of fact remain as to whether it is held by a nominee of Defendant Wilson.

## III.   CONCLUSION

For the reasons stated herein the Court orders the following:

**1)     Defendants' motion for leave to amend affirmative defenses (dkt. 43) is**

45

**DENIED.**

2)    **Defendants' motion for summary judgment (dkt. 44) is DENIED.**

3)    **Plaintiff's motion for summary judgment (dkt. 46) in granted in part as follows:**

   i)    **The Court grants money judgment against Defendant Richard Wilson for unpaid federal income tax liabilities for tax years 1991 through 1994 in the amount of $1,147,016.03 plus statutory additions after December 1, 2015, including interest.**

   ii)    **Plaintiff has a valid federal tax lien on the Holly Property and federal tax liens attach to the Holly Property and Plaintiff is entitled to enforce its tax lien against the Holly Property.**

4)    **Plaintiff's motion for summary judgment (dkt. 46) is DENIED in part as follows:**

   i)    **The motion as to money judgment against Defendant Richard Wilson for trust fund recovery penalties is denied.**

   ii)    **The motion to enforce tax lien as to the Carleton Property is denied.**


**SO ORDERED.**

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  June 9, 2016


I hereby certify that a copy of the foregoing document was served upon counsel of record on June 9, 2016, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager